UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
DAYYAN J. ARMSTRONG,                            :
                                                :
                    Plaintiff,                  :
                                                :      **MEMORANDUM AND ORDER**
         -against-                              :      12-CV-4242(DLI)(JMA)
                                                :
MANHATTAN YACHT CLUB, INC.,                     :
                                                :
                    Defendant.                  :
---------------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Dayyan J. Armstrong filed the instant action against defendant Manhattan Yacht Club, Inc. ("the Club") seeking damages under the Jones Act, 46 U.S.C. § 30104 *et seq.* ("the Jones Act"), and general maritime law, due to injuries he sustained while working for the Club on its floating clubhouse, the Honorable William Wall ("the Clubhouse"). The Club moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment (Defendant's Motion for Summary Judgment ("Def.'s Mot. for Summ. J."), Dkt. Entry No. 9), which Plaintiff opposes (Plaintiff's Memorandum in Opposition to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n), Dkt. Entry No. 13). The Club contends that, because the Clubhouse is not a "vessel," Plaintiff is not a "seaman," and cannot bring an action under the Jones Act or general maritime law. For the reasons set forth more fully below, summary judgment is granted and the complaint is dismissed in its entirety.

## BACKGROUND[1]

The Club is a community sailing organization with approximately 900 members. The Club owns a small fleet of sailboats that Club members sail for recreational purposes. (Def.'s Statement of Material Facts ("Def.'s 56.1"), Dkt. Entry No. 9-1 ¶ 1; Pl.'s Response to Def.'s

---

[1] Except where otherwise stated, the Background is taken from facts that are not genuinely in dispute.

56.1 ("Pl.'s 56.1 Resp."), Dkt. Entry No. 14 ¶ 1.) The Club keeps its sailing vessels at the North Cove Marina in lower Manhattan. (Def.'s 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2.) The Club also owns the Clubhouse. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 Resp. ¶ 3.) The Clubhouse is a two-story floating platform, which is held in place by two forty-foot vertical steel shafts secured to the seabed, known as "spuds." (Def.'s 56.1 ¶ 5; Pl.'s 56.1 Resp. ¶ 5.) Additionally, the Clubhouse is anchored to the seabed by a four-point anchoring system. (Def.'s 56.1 ¶ 7; Pl.'s 56.1 Resp. ¶ 7.) The Clubhouse is rectilinear in shape and is 30 feet wide and 76.8 feet long. (Pl.'s 56.1 Counterstatement ("Pl.'s 56.1"), Dkt. Entry No. 14, ¶ 2.)

During the sailing season (May through October), the Clubhouse is moored in New York Harbor. (Def.'s 56.1 ¶ 13; Pl.'s 56.1 Resp. ¶ 13.) During the winter, to protect it from harsh weather, the Clubhouse is moored in the North Harbor. (Def.'s 56.1 ¶ 15; Pl.'s 56.1 Resp. ¶ 15.) The Clubhouse is incapable of moving between these two locations on its own. To move it, the Club hires a crane barge to remove the spuds and to tow the Clubhouse to its new location. (Def.'s 56.1 ¶ 6, 15; Pl.'s 56.1 Resp. ¶ 6, 15.) The Clubhouse has no engine, steering mechanism, or raked bow. (Def.'s 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.) It lacks running lights, radar, navigational aids, crew and lifeboats. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.) It is listed as a "PASSENGER BARGE" on its Certificate of Inspection on file with the United States Coast Guard ("U.S.C.G."). However, as a condition of the Club's operation of the Clubhouse, the Certificate states that: "PASSENGERS SHALL ONLY BE CARRIED WHEN VESSEL IS ANCHORED, MOORED, OR MADE FAST (SPUD) TO BOTTOM." (Certificate of Inspection, attached as Ex. B to the Declaration of Michael Fortenbaugh ("Fortenbaugh Decl."), Dkt. Entry No. 9-2.)

The Club uses the Clubhouse as a viewing platform for Club members to watch various yacht races occurring in New York Harbor. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 Resp. ¶ 19.) The Clubhouse consists of a viewing platform and a bar that serves alcoholic beverages, known as the "Champagne Bar." (Def.'s 56.1 ¶ 19, 22; Pl.'s 56.1 Resp. ¶ 19, 22.) The Club does not use the Clubhouse to transport passengers. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 Resp. ¶ 20.)

The Club hired Plaintiff in 1999 and Plaintiff performed renovations and maintenance-related work at the Clubhouse and elsewhere.[2] (Def.'s 56.1 ¶ 4; Pl.'s 56.1 Resp. ¶ 4.) Plaintiff was injured on November 18, 2009 and on June 16, 2010 while working at the Clubhouse. (Def.'s 56.1 ¶ 10; Pl.'s 56.1 Resp. ¶ 10.) On August 23, 2012, Plaintiff filed the instant action, seeking damages for his injuries under the Jones Act and general maritime law. (*See generally* Complaint ("Compl."), Dkt. Entry No. 1.) Presently, the Club's motion for summary judgment is before this Court.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F. 3d 184, 202 (2d Cir. 2007) (internal quotations omitted). A fact is "material" within the meaning of Rule 56

---

[2] The parties dispute Plaintiff's job title. Plaintiff contends that he was hired as a Mate (Pl.'s 56.1 ¶ 7), whereas the Club asserts that Plaintiff was hired as a "land-based maintenance worker" (Def.'s 56.1 ¶ 4). The resolution of this factual dispute is unnecessary to the Court's analysis, as the analysis of whether the Clubhouse is a "vessel" is dispositive.

when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F. 3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F. 2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing*

4

*Gan v. City of New York*, 996 F. 2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F. 3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587.)

## II. "Vessels" under the Jones Act and General Maritime Law

"The Jones Act provides a cause of action in negligence for 'any seaman' injured 'in the course of his employment.'" *Chandris, Inv. v. Latsis*, 515 U.S. 347, 354 (1995) (quoting 46 U.S.C. App. § 688(a)). Under general maritime law, "[u]nseaworthiness is a claim . . . based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001) (citing *Mitchell v. Trawler Racer Inc.*, 362 U.S. 539, 550 (1960)). "A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Id*. (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527-28 (1938)). Like claims arising under the Jones Act, to bring a claim under general maritime law, the plaintiff must be classified as a "seaman." *See, e.g.*, *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 487-89 (2005) (discussing claims arising under the Jones Act and general maritime law).

"To qualify for seaman status, a person must have an 'employment-related connection to a vessel in navigation.'" *Lee v. Great Lakes Dredge & Dock Co.*, 2007 WL 3406924, at *2 (S.D.N.Y. Nov. 15, 2007) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991)). "The test for satisfying this requirement is twofold: (1) the worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and (2) the worker must have a connection to a *vessel in navigation* . . . that is substantial in terms of both its duration and its nature." *Id*. (emphasis added) (quoting *Chandris*, 515 U.S. at 376).

5

Consequently, to qualify as a seaman, a worker must establish that he or she worked on a "vessel in navigation."

The Jones Act does not define the term "vessel." The Supreme Court first addressed this term in *Stewart v. Dura Construction Co.*, explaining that section 3 of title 1 of the United States Code ("section 3") defines the term "vessel" for purposes of the Jones Act. *See Stewart*, 543 U.S. at 489-92. As the Court explained, section 3 "merely codified the meaning that the term 'vessel' had acquired in general maritime law." *Id*. at 490. Thus, one standard emerged under both Jones Act and general maritime cases for determining whether a particular watercraft is a "vessel," with the criteria set forth in section 3 as the starting point.

Under section 3, "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. In *Stewart*, the Supreme Court elaborated that under section 3, "a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at the particular moment." *Stewart*, 543 U.S. at 497. "The question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id*. at 496. Watercrafts that have been "permanently moored or otherwise rendered practically incapable of transportation or movement" are not vessels. *Id*. at 494. "However, a watercraft does not have to be in motion to satisfy the 'in navigation' requirement." *Lee*, 2007 WL 3406924, at *2 (citing *Stewart*, 543 U.S. at 495-96). "Instead, the 'in navigation' requirement is an element of the vessel status of the watercraft." *Stewart*, 543 U.S. at 496. Applying these standards, the Court concluded that a massive dredge, the Super Scoop, was a vessel as it engaged in maritime transportation while traversing the Boston Harbor with equipment and workers. *See id.* at 495-97. Although the Super Scoop had

limited means of self-propulsion, it was able to move short distances every few hours in its efforts to dredge the Boston Harbor. *See id*. at 484-85. Additionally, it had "a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Id*. at 484.

The Court sought to provide further guidance to courts, particularly with respect to "marginal" or "borderline" cases, in *Lozman v. City of Riviera Beach*, ___ U.S. ___, 133 S. Ct. 735 (2013). In *Lozman*, the Court concluded that a two-story home constructed of plywood that rested on top of an empty bilge space, which floated but had no means of self-propulsion, was not a vessel under section 3. *Id*. at 739-41. In reaching its result, the Court explained that "a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id*. at 741. The floating house at issue had an unraked hull with a rectangular bottom, no rudder or other steering mechanism, no capacity to generate or store electricity, and small rooms that looked like ordinary nonmaritime living quarters. *See id.* Furthermore, "[a]lthough lack of self-propulsion is not dispositive," the floating house, unlike traditional houseboats, "ha[d] no ability to propel itself." *Id*. (citations omitted).

The Court explained that cases from lower courts endorsing the "anything that floats" approach are "inappropriate and inconsistent with our precedents." *Id*. at 743. The Court emphasized that, for purposes of section 3 analysis, "[n]ot *every* floating structure is a 'vessel.'" *Id*. at 740. The Court reaffirmed *Stewart*, and distinguished the Super Scoop at issue in that case that was classified as a vessel, from floating structures in other cases that were not so classified, by noting that "the dredge was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water." *Id*. at 743.

7

**III.   The Clubhouse**

As a preliminary matter, the Court must determine precisely what, is the structure at issue. Plaintiff argues that it is the steel hull on its own, and not the combined steel hull and two-story viewing structure. There is no support for analyzing the Clubhouse in this manner. There is no evidence to suggest that the steel hull and two-story structure are severable. There is no evidence that the Club repurposed an old barge or floating structure by adding the two-story viewing structure such that it would at least be plausible to analyze the floating structure independent of the viewing structure. To the contrary, Plaintiff's own submissions indicate that the entire structure was constructed in 2002. (*See* U.S.C.G. Vessel Documentation for the Hon. William Wall, attached as Ex. 3 to the Certification of Timothy F. Schweitzer ("Schweitzer Cert."), Dkt. Entry No. 12; U.S.C.G. Summary of Maritime Information Exchange, attached as Ex. 4 to the Schweitzer Cert.) Moreover, the documentation of the U.S.C.G.'s inspections of the Clubhouse indicates that the U.S.C.G. inspects the Clubhouse as one floating structure, recommending modifications, when necessary, to both the hull and the two-story structure. (*See* Schweitzer Cert. Ex. 5.) Notably, even when a building-like structure is constructed on top of a previously manufactured floating structure, such as a new casino on an old barge, courts take into consideration the entire structure when determining its status. *See Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F. 3d 560, 563-65, 568-70 (5th Cir. 1995) (affirming summary judgment in defendant's favor as a dockside casino on a barge is not a vessel). Thus, this Court will analyze the hull and the viewing platforms as one structure, known as the Clubhouse.

The Clubhouse shares many physical characteristics and activities in common with the floating house in *Lozman*. The Clubhouse is a two-story viewing structure that rests on a buoyant rectangular structure. It has large windows, rather than watertight portholes, and there

8

are no quarters for a crew. It has no engine, steering mechanism, raked bow, running lights, radar, navigational aids, crew or lifeboats. It is incapable of self-propulsion, and must be towed by a crane barge when moved to a different location. There is no evidence that it has ever transported people or cargo while being towed, other than its own furnishings, such as the equipment and beverages contained in the Champagne Bar. During the off season (roughly six months from October to May), the Clubhouse is moored in a marina.

The Clubhouse is different from the *Lozman* floating house in several ways. The Clubhouse floats during sailing season in the middle of a harbor, whereas, the *Lozman* floating house was moored in marinas at all times. Club members are required to sail on a boat to reach the Clubhouse, whereas, the owner of the floating house in *Lozman* could freely walk on or off of the floating house when desired. There is no evidence as to whether or not the Clubhouse has the capacity to generate or store electricity; however, during sailing season, while floating in the New York Harbor, it is not connected to land-based utilities. These distinctions are not significant enough to overcome the numerous similarities with the *Lozman* floating house. These distinctions stem from the Clubhouse's location during sailing season and not from its physical characteristics and activities.[3]

It is important to note that moving the Clubhouse is not an easy task. The Club must hire a crane barge to remove the forty-foot steel spuds. Even once these spuds are removed, the Clubhouse must disconnect the four-point anchoring system from the seabed. The hired barge tows the Clubhouse to a marina where it is moored during the offseason. There is no evidence to suggest that the Club would move the Clubhouse at all if the weather permitted year-round

---

[3] In fact, these distinctions dissipate during the offseason, when the Clubhouse is moored in a marina like the *Lozman* floating house.

sailing. The Club moves the Clubhouse out of necessity—to protect it from inclement weather. Otherwise, it is secured to the seabed and stationed in New York Harbor.

Its primary purpose (and as the evidence demonstrates, its only use) is to serve as a viewing platform for Club members to watch races taking place in New York Harbor. It does not transport people, and people who wish to view the New York Harbor from the Clubhouse must ride in a boat to and from the Clubhouse. Indeed, the U.S.C.G. has prohibited the Clubhouse from carrying people when the Clubhouse is not moored and spudded to the seabed. (*See* Fortenbaugh Decl. Ex. B.) Other than serving as a viewing platform during sailing season, the Clubhouse is towed to rest at its winter location, where it sits empty and idle.

Plaintiff argues that the Clubhouse is a vessel because it is listed as a passenger barge on the Certificate of Inspection and that all passenger barges are vessels. Plaintiff also argues that the Clubhouse is a vessel because the U.S.C.G. conducts inspections of the Clubhouse and that these inspections signify vessel status. Neither of the parties has provided the Court with any evidence as to how the U.S.C.G. classifies floating platforms for registration purposes, or whether that classification or the U.S.C.G.'s inspections have any legal bearing to the Clubhouse's status under the Jones Act and general maritime law. Notably, in an unreported opinion, the Fifth Circuit concluded that a floating oil and gas platform, moored to the ocean floor, was not a "vessel," even though it was registered with the U.S.C.G. as an "industrial vessel" and was subject to routine inspections by the U.S.C.G. *See Mendez v. Anadarko Petro. Corp.*, 466 Fed. App'x 316, 317-19 (5th Cir. 2012) (per curiam) (affirming summary judgment in employer's favor as the floating platform was not a vessel); *see also Pavone*, 52 F. 2d at 564, 568-70 (declining to extend vessel status to a dockside casino barge, even though the barge at issue was registered with the U.S.C.G. and licensed with the Mississippi Gaming Commission,

10

which only licenses operators of "vessels" and "cruise vessels"). *Mendez* underscores this Court's duty to evaluate the physical characteristics and activities of the Clubhouse to determine whether it is a vessel. Otherwise, this Court would be improperly delegating its analysis to the U.S.C.G. and its classification system.

Plaintiff attempts to distinguish the Clubhouse from the *Lozman* floating house based on size. The Clubhouse is larger than the floating house in *Lozman*; however, size alone is not a dispositive factor. Since *Lozman*, courts have concluded that floating structures far larger than the Clubhouse did not qualify as vessels. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 2013 WL 311084, at *3-5 (S.D.N.Y. Jan. 25, 2013) (concluding that the "Drydock," a structure that floated on an intricate pontoon system, and was one of the world's largest drydocks, was not a vessel); *see also Mooney v. W&T Offshore, Inc.*, 2013 WL 828308, at *5-6 (E.D. La. Mar. 6, 2013) (concluding that a large oil and gas platform permanently attached to the seabed is not a vessel). Indeed, these cases, which involve large, intricate floating structures, reiterate the general understanding that *Lozman*, "sent a shot across the bow of those lower courts that have endorsed the 'anything that floats' approach." *Fireman's Fund*, 2013 WL 311084 at *7 (quotations omitted).

Finally, Plaintiff's reliance on *Lee v. Astoria Gen. Co.*, 13 N.Y.3d 382 (2009), is misplaced. In *Lee*, the New York State Court of Appeals held that a barge containing an electricity generating turbine that was anchored and stationed in the Gowanus Bay, was a vessel. *See Lee*, 13 N.Y.3d at 391. The floating structure at issue in *Lee* is distinguishable from the Clubhouse. First, the floating structure in *Lee* carried cargo, as it housed an electricity generating turbine. *See id.* at 388. Second, the floating structure was "capable of being moved for the purpose of providing electric power at other locations" in New York, *id.* at 387, and had

11

done so "at least once." *Id*. at 391. Thus, it was both designed and used to transport cargo. *See id*. ("[T]he barge at issue is practically capable of being used as a means of transportation on water."). Accordingly, the Court does not find *Lee* persuasive as to whether the Clubhouse, which is prohibited from transporting people and never transported people or cargo, is a vessel.

The Court concludes that a reasonable observer, looking to the Clubhouse's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water. The Clubhouse is not a vessel. Consequently, Plaintiff is not a "seaman" and summary judgment is granted in the Club's favor on Plaintiff's claims arising under the Jones Act and general maritime law.

## CONCLUSION

For the reasons set forth above, the Club's motion for summary judgment is granted. The case is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
       April 26, 2013

/s/
DORA L. IRIZARRY
United States District Judge